**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**HELENA DIVISION**

| | |
|---|---|
| SAVE THE BULL TROUT AND ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR AND WEST SIDE DITCH COMPANY,<br><br>Defendant. | Cause No. CV-25-45-H-BMM<br><br>ORDER |

## INTRODUCTION

Plaintiffs Save the Bull Trout and Alliance of the Wild Rockies (collectively "Plaintiffs") move the Court for a temporary restraining order and preliminary injunction. (Doc. 80.) Plaintiffs seeks an order enjoining Defendants U.S. Department of the Interior ("DOI") and West Side Ditch Company ("West Side") (collectively "Defendants") from diverting water from the Upper Clark Fork River (UCF) at the West Side Ditch (WSD) when the streamflow at the U.S. Geological Survey gauge in Deer Lodge, Montana falls below 90 cfs to ensure the functional integrity of bull trout critical habitat. (Id. at 6.) Defendants oppose the motion. (Docs. 88 and 89.) The Court held a hearing on August 28, 2026. (Doc. 93.) The Court

grants Plaintiffs' motion for a temporary restraining order and preliminary injunction.

**BACKGROUND**

Plaintiff Save the Bull Trout is a non-profit public interest organization dedicated to saving the bull trout species. (Doc. 1 ¶ 11.) Plaintiffs Alliance for the Wild Rockies is a tax-exempt public interest organization dedicated to preservation of biodiversity in the Northern Rockies. (Id. ¶ 12.)

Plaintiffs have brought this action against Defendants on claim of violation of Endangered Species Act (ESA), 16 U.S.C. §§1532 et seq. and violations of the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq., (Doc. 9 at 2.) Plaintiffs allege that Defendants unlawfully take threatened bull trout "via entrainment and inducement of suboptimal instream flow on the section of the UCF River downstream of the WSD." (Id.)

Plaintiffs contend that 62.8 miles of the Upper Clark Fork River (UCF) is designated by the U.S. Fish & Wildlife Service (FWS) as critical habitat for the bull trout. (Doc. 1 ¶ 18.) Plaintiffs allege that DOI, through the National Park Service ("NPS"), operates the Grant-Kohrs Ranch National Historic Site in Deer Lodge, Montana that abuts the UCF. (Id. ¶ 15.) NPS diverts water from West Side Ditch for agricultural purposes. (Id. ¶ 19.) West Side diverts water of the UCF near Deer

Lodge, Montana for irrigation purposes. (Id. ¶ 21.); (Doc. 21 at 8-9.) The ESA lists bull trout as threatened. (Doc. 1 ¶ 18.)

Plaintiffs contend that a streamflow of 90 cfs is required to support a fishery in the UCF, and any lesser flows can cause degradation of the aquatic habitat. (Doc. 10 at 6.); (Doc. 81 at 11.) Plaintiffs allege the streamflow on the UCF has dropped below 90 cfs numerous times causing degradation of the bull trout habitat. (Doc. 1 ¶ 31.) Specifically, Plaintiffs claim that the streamflow has fallen below 90 cfs on August 3, 2026, and August 7, 2026 (Doc. 81 at 6.) Plaintiffs contend Defendants' diversion of water results in the unpermitted take and entrainment of bull trout in violation of the ESA. Plaintiffs also contend that DOI's biological opinion ("BiOp") of the UCF did not adequately assess the impacts of the West Side Ditch users dewatering. Plaintiffs assert that irreparable harm will result in the absence of a temporary restraining order or preliminary injunction.

The Court previously granted Plaintiffs a TRO last summer on September 17, 2025, temporarily enjoining Defendants from diverting water when the flows fell below 90 cfs. (Doc. 25.) The Court subsequently denied Plaintiffs request for a preliminary injunction in October of 2025. (Doc. 40.) The Court reasoned that

Plaintiffs were unlikely to suffer irreparable harm as the irrigation season concluded. (Id. at 5.)

## STANDARD OF REVIEW

District courts enjoy discretion regarding the grant or denial of a temporary restraining order or preliminary injunction. *Miss Universe, Inc. v. Flesher,* 605 F. 2d 1130, 1132-33 (9th Cir. 1979); *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). Fed R. Civ. P. 65 governs preliminary injunctions and temporary restraining orders. "The standard for issuing a TRO is 'substantially identical' to the standard for granting a preliminary injunction." *Elko, Inc. v. Peters*, 2022 U.S. Dist. LEXIS 14920 at *4 (D. Nev. Jan. 27, 2022) (citing *Stuhlberg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir.)). A plaintiff seeking a temporary restraining order or preliminary injunction must establish the following four factors: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

## DISCUSSION

Plaintiffs again allege that Defendants' diversion of water from the UCF when flow is below 90 cfs constitutes an unpermitted take of the threatened bull trout. Plaintiffs argue that the take of bull trout causes irreparable harm to the bull trout and Plaintiffs' member interests. (Doc. 81 at 26-31.) Defendants counter that

Plaintiffs failed to establish that they are likely to succeed on the merits, or that Plaintiffs are likely to suffer irreparable harm absent preliminary relief. (Docs. 88 and 89).

## I. Whether Plaintiffs have satisfied the requirements for a preliminary injunction under Fed. R. Civ. P. 65 and *Winter*.

A plaintiff seeking a temporary restraining order must establish the following: (1) a likelihood to succeed on the merits, (2) a likelihood of suffering irreparable harm absent preliminary relief, (3) a balance of equities favoring the movant, and (4) that an injunction supports public interest. *Winter*, 555 U.S. at 20.

### a. Likely to succeed on the merits on claims against DOI

A plaintiff must show that the defendant unlawfully "took" an endangered species in order to prevail on a take of an endanger species claim under ESA § 9. "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. §1532(19). Harm "means an act which actually kills or injures wildlife[,]" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R.§17.3. A take that is incidental, but not the purpose of, may be lawful if permitted upon receipt of an incidental take statement ("ITS"). 16 U.S.C. §§1536(b)(4), 1539(a)(1)(B).

The Court previously determined that Plaintiffs had established a likelihood to succeed on the merits of their ESA claims against Defendants. (*See* Doc. 28.) Plaintiffs continue to establish a likelihood of success on the merits. NPS has an ITS. The bull trout is a listed endangered species. A party may be liable under the ESA § 9 if it fails to implement mandatory condition of the ITS and exceeds the take authority. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001). Takes which exceed the ITS require the reinitiation consultation and support liability for ESA § 9 violations. *Cal. Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F.Supp.3d 1102, 1115 (C.D. Cal. 2015) (citing *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1239).

Plaintiffs allege that NPS failed to implement the ITS's required conditions and failed to reinitiate consultation with FWS. The ITS contains reasonable prudent measure ("RPM") NPS must implement. NPS is required by the ITS to develop a timeline for the implementation of the RPM. These RPM include the following conditions: (1) NPS identify and implement means to reduce the potential for incidental take of bull trout from resulting irrigation entrainment; (2) NPS identify and implement means to reduce the potential for incidental take of bull trout from fish passage barriers; and (3) NPS identify and implement means to reduce the potential for incidental take of bull trout from dewatering impacts. (Doc. 81 at 14-15.) NPS is required as a condition of the first RPM to install fish

screens on all infrastructure over which NPS has unilateral control, and to "work with partners" to screen shared infrastructure. (Id. at 14.)

Plaintiffs allege that NPS failed to implement these RPMs. NPS allegedly has failed to develop a timeline for the implementation of the RPMs, has not sufficiently worked with partners to install fish screens or address risks created by shared infrastructure, and has not completed an instream flow study or drought management plan and does not have a timeline for the completion of these tasks. (Id. at 20-22). To date, Defendants have failed to provide a fish screen on the West Side Ditch headgate or make any substantial changes to decrease the potential for entrainment of fish. (Id. at 16.)

The Court recognizes the progress made by NPS on compliance with its ITS. NPS has evaluated and installed fish screens on the infrastructure within its unilateral control. (Doc. 88 at 11.) It has made progress in the data collection for the required studies. (Id. at 13-14.) It has participated in processes which have resulted in progress towards the installation of fish screens on shared infrastructure. (Id. at 11-12.) And the Court notes that NPS itself does not currently divert water when the flow drops below 90 cfs. (Id. at 1.)

NPS has failed, however, to meaningfully engage West Side on the installation of a fish screen beyond exercising its voting rights as a shareholder. (Doc. 88-3 at 52.) It appears that NPS has failed to instigate or develop a plan, seek

shareholder support, address the concerns of shareholders, pursue funding, or otherwise pursue the installation of a fish screen on the West Side Ditch. (Doc. 81 at 20-21.) NPS instead allows West Side to continue its entrainment and dewatering impacts on bull trout, even in low flow time periods. (Id.)

NPS has also failed to produce a timeline for achievement of its RPMs (Doc. 81 at 20.) The Court recognizes the challenges of establishing a timeline for complex, multiparty projects. The development of a timeline is a routine component of an ITS, which often are complex undertakings. These collective actions likely violate the ESA § 9 and constitute an unauthorized take. NPS's actions and inactions exceed the limitations imposed in the ITS.

**b. Plaintiff is likely to succeed on the merits of the claims against West Side.**

Infrastructure that limits access, injures, or kills listed species can be determined as a take under the ESA. *Wishtoyo Found v. United Water Conservation Dist.*, 2018 WL 6265099, at *58–61 (C.D. Cal. Sept. 23, 2018), *aff'd* 795 Fed. Appx 541 (9th Cir. 2020). "It is well-settled that an activity that modifies a species' habitat in a manner that 'significantly impairs the breeding and sheltering of a protected species amounts to harm under the ESA.'" *San Luis Obispo Coastkeeper*, 758 F.Supp.3d at 1165 (quoting *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996)).

West Side does not have a permit or ITS. Plaintiffs allege that West Side's diversion of water harms the bull trout and modifies the bull trout habitat on the UCF. Plaintiffs have provided data showing that West Side has diverted water this year when streamflows fall below 90 cfs. (Doc. 81 at 25.) The low streamflow caused by the diversion of water by West Side results in the UCF's inability to sustain food and habitat to maintain the bull trout population. (FWS000044, 45.) Plaintiffs are likely to succeed on the merits of its ESA § 9 claims against Defendants.

## II. Likely to suffer irreparable harm absent the requested relief

The Court previously found that Plaintiffs were likely to suffer irreparable harm absent a temporary restraining order. Plaintiffs again have established that they are likely to suffer irreparable harm. The current flow levels of the UCF threaten irreparable harm to the bull trout and Plaintiffs interests in the area. (Doc. 81 at 26.) "A reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996.) Plaintiffs do not need to show an "extinction-level threat" to a species. *Nat'l Wildlife Fed'n*, 886 F.3d at 818–19. Rather, "[t]he ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species . . . . Harm to those members is irreparable because once a member of an

endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id*. at 818 (internal citations omitted).

The BiOp indicates that 90 cfs represents the minimum flow necessary to support the bull trout. (FWS000045.) The BiOp further classified the bull trout and its habitat as "Functioning at Unacceptable Risk." (FWS000035, 36.) Plaintiffs allege that the flows in the UCF have been reported below that threshold this summer. For example, Plaintiffs allege that the flows fell below 90 cfs on August 3, 2026, and August 7, 2026. (Doc. 81 at 28.) Continued diversion of water when the Deer Lodge gauge falls below 90 cfs has caused or is likely to cause harm to the bull trout. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 820–21 (9th Cir. 2018). Recent rainfall has raised the flow to 117 cfs as of the date of filing. The Court notes that the likelihood of future dry conditions within the next month remains sufficiently high to support a preliminary injunction.

Defendants' continued failure to mitigate the threats related to bull trout entrainment, the fish screen, and plans to address drought management further establish a likelihood of irreparable harm to Plaintiffs. Plaintiffs also assert that they remain likely to suffer irreparable harm to their member interests such as to "their aesthetic, recreational, scientific, spiritual, and educational interests" absent a TRO or preliminary injuction. (Doc. 81 at 29-30.) Plaintiffs will have a diminished opportunity to use and enjoy the area under the current low flow circumstances.

Plaintiffs have established that absent a temporary restraining order or preliminary injunction enjoining Defendants from diverting water when flows fall below 90 cfs that the bull trout may experience harm such as entrainment and fish blockage.

**III. Balance of the Equities and Public Interest**

The balance of the equities and the public interest tips in Plaintiffs' favor because the alleged ESA violations likely cause harm to a protected species, bull trout. The "balance of hardships and the public interest tips heavily in favor of protected species." *See, e.g., Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994). Defendants emphasize that though the presumption lies in favor of protecting species covered by the ESA, the Plaintiff still must meet the burden of proof for the first two prongs. (Doc. 88 at 22-23, Doc. 89 at 25). The Court finds that they do. Additionally, Defendant West Side contends that the burden on its members has substantially increased since this Court last considered this motion due to the earlier timing in the irrigation season. (Doc. 89 at 25-27). The Court acknowledges the hardship to Defendants who must cease or limit their diversion of water when the flow drops below 90 cfs during the remainder 2026 irrigation season. The Court notes the infrequency with which these conditions occur. Given the low flows and alleged harm resulting to the bull trout, as well as the infrequency of negative impacts on the Defendants, the balance of equities tips in favor of Plaintiffs and

granting a preliminary injunction. Defendants still may divert water when flows exceed 90 cfs to diminish the alleged harm to Defendants.

## CONCLUSION

Plaintiffs have established the requirements under Fed. R. Civ. P. 65 and *Winter*. A preliminary injunction enjoining Defendants from diverting water from the UCF at the West Side Ditch when the streamflow at the U.S. Geological Survey gauge in Deer Lodge, Montana falls below 90 cfs proves warranted.

## ORDER

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 80) is **GRANTED**. Plaintiff's Motion for a Temporary Restraining Order (Doc. 80) is rendered moot by the granting of a preliminary injunction and is therefore **DENIED.**

- Defendants DOI and West Side shall halt the diversion of water from the Upper Clark Fork at the West Side Ditch when the streamflow at the U.S. Geological Survey gauge in Deer Lodge, Montana falls below 90 cfs.

DATED this 4th day of September 2026.

Brian Morris, Chief District Judge
United States District Court