Timothy M. Bechtold
**BECHTOLD LAW FIRM, PLLC**
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Alizabeth A. Bronsdon
**BRONSDON LAW FIRM, PLLC**
P.O. Box 7262
Missoula, MT 59807
(267) 664-3422
bronsdonlaw@gmail.com

Elizabeth M. Forster
**FORSTER LAW, PLLC**
P.O. Box 30342
Billings, MT 59107
(406) 318-5354
liz@forster-law.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**HELENA DIVISION**

| | |
|---|---|
| SAVE THE BULL TROUT and ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. DEPARTMENT OF THE INTERIOR, and WEST SIDE DITCH COMPANY,<br><br>Defendants. | CV-25-45-H-BMM<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS


**TABLE OF CONTENTS** .......... **2**

**TABLE OF AUTHORITIES** .......... **3**

**INTRODUCTION** .......... **5**

**STATEMENT OF FACTS** .......... **6**

**STANDARDS OF REVIEW** .......... **6**

- **A. Endangered Species Act** .......... **6**
- **B. Summary Judgment** .......... **8**

**ARGUMENT** .......... **8**

- **A. West Side Ditch Company has caused take of bull trout in violation of ESA §9** .......... **10**
  - **1. *Dewatering*** .......... **11**
  - **2. *Entrainment*** .......... **14**
  - **3. *Fish passage barrier*** .......... **17**
- **B. DOI has not complied with the nondiscretionary reasonable and prudent measures in the ITS** .......... **18**
  - **1. *FWS and DOI have failed to adopt an implementation timeline*** .......... **20**
  - **2. *NPS has failed to implement RPM 1*** .......... **21**
  - **3. *NPS has failed to implement RPM 2*** .......... **24**
  - **4. *NPS has failed to implement RPM 3*** .......... **24**
  - **5. *NPS has caused take of bull trout*** .......... **26**
- **C. FWS's failure to assess the cumulative effects of the other diversions and diversion structures in the action area in the BiOp violates ESA §7** .......... **26**

**CONCLUSION** .......... **31**

**CERTIFICATE OF COMPLIANCE** .......... **32**

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Marten*, 685 F.Supp.3d 971 (D. Mont. 2023)......27
*Arizona Cattle Growers' Association v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001)........................................................................................ 19, 28
*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995).......................................................................................................7, 14
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).........................................................8
*Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) 19, 20, 21
*Center for Biological Diversity v. BLM*, 698 F.3d 1101 (9th Cir. 2012) ........ passim
*Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988).................................................8
*Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048 (9th Cir. 2013) .....27
*Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018) ......................6
*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999) .................................7
*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ...............................................................................................................................10
*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)............................... 28, 30
*Loggerhead Turtle v. Council of Volusia County, Fla.*, 896 F.Supp. 1170 (M.D. Fla. 1995) .....................................................................................................10
*Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996)..................................10
*Motor Vehicle Manufacturers Association v. State Farm Mututal Automobile Insurance Co.*, 463 U.S. 29 (1983)......................................................................28
*N.L.R.B. v. Brown*, 380 U.S. 278 (1965) ..............................................................28
*National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917 (9th Cir. 2008)..........................................................................................19
*National Wildlife Federation v. U.S. Army Corps of Engineers*, 384 F.3d 1163 (9th Cir. 2004) ................................................................................................ 23, 26
*Natural Resource Defense Council v. Kempthorne*, 506 F.Supp.2d 322 (N.D. Cal. 2007) .........................................................................................................29
*Puyallup Tribe of Indians v. Electron Hydro, LLC*, 2024 WL 664407 (W.D. Wash. Feb. 16, 2024), *aff'd*, 2024 WL 3842099 (9th Cir. Aug. 16, 2024) ....................15
*Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996).....................................................11
*San Luis Obispo Coastkeeper v. County of San Luis Obispo*, 758 F.Supp.3d 1153 (C.D. Cal. 2024)..........................................................................................15
*Selkirk Conservation v. Forsgren*, 336 F.3d 944 (9th Cir. 2003)...........................22
*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) .................................... passim
*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978).........................................6
*Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ........27

*Western Watersheds Project v. McKay*, No. 22-35706, 2023 U.S. App. LEXIS 28484, at *7–8 (9th Cir. Oct. 26, 2023) ........ 21
*Wishtoyo Foundation v. United Water Conservation District*, 2018 WL 6265099, at *57 (C.D. Cal. Sept. 23, 2018) , *aff'd* 795 Fed. App'x 541 (9th Cir. 2020).. 10, 15, 18

**Statutes**

16 U.S.C. §1532 ........ 6
16 U.S.C. §1536 ........ 7, 19
16 U.S.C. §1538 ........ 6
5 U.S.C. §706(2) ........ 27, 28

**Rules**

Fed. R. Civ. P. 56 ........ 8

**Regulations**

50 C.F.R. §402.14 ........ 19, 27

## INTRODUCTION[1]

More than three years after the U.S. Fish & Wildlife Service ("FWS") issued the National Park Service ("NPS") a permit requiring NPS to mitigate the adverse effects of NPS's operations at the Grant-Kohrs Ranch National Historic Site ("GRKO") on bull trout and bull trout critical habitat in the Upper Clark Fork River ("UCF"), NPS has made little progress on implementing the measures that were deemed necessary to not jeopardize the listed species. FWS's Incidental Take Statement ("ITS") and the Endangered Species Act's ("ESA") rigorous obligations to prevent the extinction of listed species and ensure their recovery require more—NPS must meaningfully engage its partners to replace irrigation infrastructure that harms bull trout, initiate an instream flow study, and develop a low flow/drought management plan. NPS has failed to fulfill its duties, in violation of the ESA.

At the same time, Defendant West Side Ditch Company ("WSDC") is causing take of bull trout by diverting significant portions of the UCF when FWS determined low flows are lethal for bull trout, frustrating efforts to install a fish screen on the West Side Ditch to prevent entrainment, and continuing to maintain a diversion dam that prevents bull trout from moving up- and downstream to access seasonal habitats.

Defendants' non-compliance with the ESA has contributed to, and will

[1] The administrative record is cited as "NPS[Bates No.]" for National Park Service documents and "FWS[Bates No.]" for Fish & Wildlife Service documents.

continue to exacerbate, the decline of bull trout populations and deterioration of bull trout critical habitat in the UCF. Accordingly, Plaintiffs respectfully request this Court enter judgment in favor of Plaintiffs on Counts I, II, and III.

## STATEMENT OF FACTS

Pursuant to Local Rule 56.1, the relevant facts are set forth in Plaintiffs' Statement of Undisputed Facts.

## STANDARDS OF REVIEW

### A. Endangered Species Act

The ESA is considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and embodies Congress's "'commitment to halt and reverse the trend toward species extinction, whatever the cost.'" *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978)).

ESA §9 prohibits the "take" of endangered or threatened species, including bull trout. 16 U.S.C. §1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. §1532(19). Harm "means an act which actually kills or injures wildlife[,]" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral

patterns, including breeding, feeding or sheltering." *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 696–700 (1995). Plaintiffs have the burden of proving by a preponderance of the evidence that Defendants' actions resulted in a take. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999).

Under ESA §7(a)(2), federal agencies must consult with FWS to ensure that any action they authorize, fund, or carry out that may directly or indirectly affect listed species "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the species' designated critical habitat. 16 U.S.C. §1536(a)(2). FWS's evaluation and opinion is memorialized in a "biological opinion" or "BiOp." If the BiOp concludes that an agency's action will cause a take that is incidental to—not the purpose of—the action, the otherwise lawful activity may be permitted upon receipt of an incidental take statement ("ITS"), subject to any nondiscretionary reasonable and prudent measures and corresponding terms and conditions imposed in the ITS. *Id.* §§1536(b)(4), 1539(a)(1)(B).

The ESA imposes a "rigorous duty" on federal agencies to ensure its actions are not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987) (citing 16 U.S.C. §1536(a)(2)). Indeed, "[t]he substantive and procedural provisions of the ESA are *the* means determined by

Congress to assure adequate protection [of listed species].” *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1114 (9th Cir. 2012) (quoting *Marsh*, 816 F.2d at 1384). Reviewing courts must “afford[] endangered species the highest of priorities,” and act with “institutionalized caution” when reviewing ESA cases. *Marsh*, 816 F.2d at 1386. If any doubt exists pertaining to legal arguments raised by plaintiffs, courts must “give the benefit of the doubt to the species.” *Connor v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

### B. Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## ARGUMENT

Bull trout are listed as threatened under the Endangered Species Act. SUF ¶2. FWS designated the 20 miles of the UCF in Montana between the West Side Ditch diversion between Galen and Deer Lodge, and the southern boundary of GRKO in Deer Lodge as critical habitat for bull trout that provides foraging, overwintering, and migration habitat. SUF ¶29.

The West Side Ditch headgate is owned by the WSDC. SUF ¶36. WSDC is an irrigation district representing the largest water user group in the UCF; WSDC owns water rights claims to 85.21 cfs. SUF ¶36. The WSDC is comprised of seven

shareholders. SUF ¶36. NPS holds 100 shares, or about 16%, of WSDC. SUF ¶37. It uses water from the WSD to irrigate GRKO, which is a living historic ranch near Deer Lodge. SUF ¶37. In addition to its shares in the WSDC, NPS owns seven water rights for irrigation at GRKO totaling 22.38 cfs and uses four other irrigation systems/ditches to convey water. SUF ¶40.

In June 2023, FWS issued a Biological Opinion ("BiOp") evaluating the effects of GRKO's irrigation practices on bull trout and its critical habitat in the UCF. SUF ¶43. The BiOp determined NPS's operations at GRKO, when considered with implementation of the mandatory terms and conditions in the incidental take statement, are not likely to jeopardize the continued existence of bull trout at the range-wide scale. SUF ¶82. The BiOp also concluded that NPS's operations at GRKO are not likely to destroy or adversely modify critical habitat while acknowledging "[i]mprovements to degraded conditions are unlikely to occur" and "the proposed action will continue to contribute to critical habitats being non-functional 40% of the time during annual operation." SUF ¶83.

Plaintiffs sued Defendants on June 17, 2025. Doc. 1. Plaintiffs allege that DOI, through NPS, has not complied with the nondiscretionary terms and conditions in the ITS for GRKO, causing take of bull trout in violation of ESA §9 (Count I); WSDC is causing take of bull trout without a valid incidental take permit, in violation of ESA §9 (Count II); and DOI, through FWS, failed to assess the

cumulative effects to bull trout from the other irrigation infrastructure in the UCF in determining whether NPS's operations at GRKO were likely to jeopardize the species or adversely modify its critical habitat (Count III).

Plaintiffs move for summary judgment on all claims.

### A. West Side Ditch Company has caused take of bull trout in violation of ESA §9.

WSDC has caused take of bull trout by dewatering the UCF when flows are at levels lethal for bull trout, not screening its headgate, and impeding fish passage with its dam. These actions constitute take and violate ESA §9.

A plaintiff can establish harm to wildlife with evidence of past injury, present injury, or an "imminent threat" of future injury. *Wishtoyo Found. v. United Water Conserv. Dist.*, 2018 WL 6265099, at *57 (C.D. Cal. Sept. 23, 2018) , *aff'd* 795 Fed. App'x 541 (9th Cir. 2020) (citing *Forest Conserv. Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995)). "The future threat of [even a] single taking is sufficient to invoke the authority of the [ESA]." *Loggerhead Turtle v. Council of Volusia Cnty., Fla.*, 896 F.Supp. 1170, 1180 (M.D. Fla. 1995). "It is well-settled that an activity that modifies a species' habitat in a manner that 'significantly impairs the breeding and sheltering of a protected species amounts to harm under the ESA.'" *San Luis Obispo Coastkeeper*, 758 F.Supp.3d at 1165 (quoting *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996)).

A non-federal agency entity like WSDC can be immunized from incidental

take only if it obtains an incidental take permit under ESA §10, 16 U.S.C. §1539(a)(1)(B), or if a federal agency's Incidental Take Statement "contemplates" the entity's actions, and the ITS is being complied with, Doc. 41 at 11–12; *Ramsey v. Kantor*, 96 F.3d 434, 442–43 (9th Cir. 1996).

WSDC has not applied for or been granted an incidental take permit under ESA §10. It therefore has no immunity for any take under the ESA.

*1. Dewatering*

WSDC consistently diverts a substantial portion of the UCF when flows are below the levels the current best available science has established are necessary for bull trout to survive and for bull trout habitat to provide adequate foraging, migration, and overwintering conditions. WSDC's alteration of bull trout critical habitat is "harm" to fish, and therefore constitutes an unlawful take under ESA §9.

Streamflow is the "most powerful predictor of fish survival." SUF ¶21. Low stream flows can limit a bull trout's ability to traverse up or downstream, limit the availability of prey resources, and make individuals more susceptible to predation. *Id.*

FWS has determined that bull trout in the UCF require flows of at least 180 cfs at the West Side Ditch to maintain abundant, healthy, and thriving bull trout populations. SUF ¶¶69–70. When flows drop below 180 cfs, the capacity of the UCF to produce food for bull trout begins to decline. *Id.* When flows drop below 90 cfs,

the river's ability to produce food becomes "unacceptable," and bull trout likely cannot survive. *Id*. Maintaining flows in the section of the UCF at and below the WSD is particularly important because FWS has designated that section of river as critical habitat that provides essential feeding—as well as migration and overwintering—habitat for bull trout. SUF ¶29. Stream flows in the UCF consistently fall to levels that are lethal to bull trout in mid- to late summer. SUF ¶¶71–77.

Degraded flows also cause water temperatures to exceed the threshold for bull trout survival. Bull trout require cold water to survive. SUF ¶¶15–19. Between 20 to 22 degrees Celsius bull trout cease feeding and do not grow. SUF ¶19. At temperatures above 23 degrees Celsius, mortality rates increase. *Id*. At temperatures above 26 degrees Celsius, juvenile bull trout are expected to die in under 24 hours. *Id*.

During July and August, water temperature in the UCF at and below the WSD often reaches and exceeds 20 degrees Celsius. SUF ¶79. During the irrigation seasons in 2022 to 2025, maximum daily temperatures at the U.S. Geological Survey gauge in Deer Lodge, which is downstream of the WSD, were between 23.6 and 24.6 degrees Celsius. SUF ¶79.

The most severely dewatered section of the UCF is just after the WSD headgate. SUF ¶35. WSDC has historically diverted between 27 to 43 cfs from the

UCF. SUF ¶39. In low flow years, WSDC diversions can be more than half of the river's total flow. *Id.*

In 2024, flows at the Deer Lodge gauge were below 90 cfs from July 12 to September 12, September 15 to September 17, and September 26 to October 4. SUF ¶74. WSDC claims not to know if its ditch rider ever closed the headgate in 2024. SUF ¶75.

In 2025, flows were below 90 cfs 11 times in July and were consistently below 90 cfs between August 11 and when this Court granted Plaintiffs' first Motion for Temporary Restraining Order on September 17. SUF ¶76. WSDC closed the headgate only after the Court issued the temporary restraining order. SUF ¶77.

Notably, on August 13, 2025, when flows at the Deer Lodge gauge were between 67 cfs and 70 cfs, WSDC diverted 34.46 cfs from the UCF. SUF ¶77. The significance of the removal of 34 cfs of flow to bull trout habitat is underscored by FWS's finding in the BiOp that the impact of GRKO leaving just 15.7 cfs more in the river during times of low flow "could have significant impact on maintaining flows especially in low flow years." SUF ¶78.

WSDC's practice of removing upwards of half the flow of the UCF during mid- to late-summer significantly contributes to flows in the UCF falling below the threshold necessary for bull trout survival. Ex. 1 (Young Report) at 6. This practice, in return, threatens bull trout survival because it leads to poor foraging conditions,

the reduction or cessation of bull trout feeding, and warmer water temperatures that are lethal to bull trout. Ex. 1 at 5–10. This dewatering also limits a bull trout's ability to traverse up and downstream—thereby disrupting spawning and decreasing egg and young juvenile survival—and makes individuals more susceptible to predation. SUF ¶21. WSDC's impairment of the habitat conditions bull trout need for food, and therefore growth and survival, is killing and harm, and therefore take, under ESA §9. Doc. 40 at 8; Doc. 98 at 8–9; *Sweet Home*, 515 U.S. at 696–700.

Restoration of flow by preventing WSDC from diverting water during low flow periods would reduce the number of days flows fall below the 90 cfs threshold for bull trout, delay or prevent flows from ever reaching that level, significantly reduce water temperatures, increase bull trout foraging, and ultimately increase bull trout survival and recovery in the UCF. Ex. 1 at 6, 10. Consequently, Plaintiffs' requested relief—that the Court order WSDC to refrain from removing or diverting water when flows are below 110 cfs—would remedy this take. Doc. 1 at 18.

*2. Entrainment*

WSDC's irrigation infrastructure is also causing take because its unscreened headgate entrains bull trout.

Courts have found infrastructure that limits access to important habitat or injures or kills listed species causes take. *Wishtoyo Found.*, 2018 WL 6265099 at *58–61 (diversion dam caused take of steelhead due to lack of access to habitat,

injury and mortality when passing the dam, and flow alterations impacting migration); *San Luis Obispo Coastkeeper v. Cty. of San Luis Obispo*, 758 F.Supp.3d 1153, 1163–67 (C.D. Cal. 2024) (dam likely caused take of steelhead by limiting access to and degrading habitat); *Puyallup Tribe of Indians v. Electron Hydro, LLC*, 2024 WL 664407, at *3–5 (W.D. Wash. Feb. 16, 2024), *aff'd*, 2024 WL 3842099 (9th Cir. Aug. 16, 2024) (dam's temporary spillway caused take of listed fish by obstructing safe fish passage and hindering reproduction).

The BiOp concluded the WSD headgate poses a "high risk" of entrainment of fish because it does not have a fish screen. SUF ¶55. Without a fish screen, bull trout's successful passage through the WSD is "unlikely given the length of the ditch, the number of opportunities to be entrained a second time, and the overall habitat condition (water quality) within the ditch." SUF ¶57. Entrained fish can die or experience reduced growth because the ditch water is warm, slow-moving, and becomes contaminated with agricultural runoff before it returns to the UCF. SUF ¶57.

The threat of entrainment is particularly high at the WSD because entrainment risk is often greatest during low flows when the WSD headgate is open and can entrap fish. Ex. 1 at 12. In July 2026, NPS found dead fish in WSD at GRKO that had been entrained in the ditch. SUF ¶61. NPS also reported that it observed unidentified fish swimming in the WSD at GRKO that had been entrained. *Id.*

WSDC has previously refused the installation of the fish screen and is continuing to frustrate installation efforts. SUF ¶¶98–111; *see also* Doc. 40 at 8–9 (finding WSDC likely caused take of bull trout by refusing installation of a fish screen to avoid entrainment of bull trout).

Trout Unlimited secured a U.S. Bureau of Reclamation grant for the fish screen in 2024. SUF ¶¶99–101. WSDC rejected the funding and the screen. SUF ¶103. Funding was still available in October 2025—after Plaintiffs filed this suit and secured a temporary restraining order. SUF ¶104. WSDC then signed a letter of intent to participate in the design process. SUF ¶106. However, WSDC has again frustrated the process, which may result in the grant funds expiring.

At a WSDC shareholder meeting on August 4, 2026, Trout Unlimited and the firm hired to construct the screen requested that WSDC select a design within a week, or by August 11, 2026, to ensure that a final design could be prepared by the firm by the end of the year before Trout Unlimited's grant for the design expires. SUF ¶¶107–10. Trout Unlimited explained that it could not get an extension for the grant if the final design is not complete before the end of the year. SUF ¶110. Despite the need for a timely decision, WSDC President Pat Verlanic responded that he was "not sure" when WSDC would select a design. SUF ¶111. As of August 28, 2026, WSDC had not selected a design. SUF ¶113.

In sum, WSDC's unscreened headgate has entrained and is entraining bull

trout, which is take in violation of ESA §9. Additionally, WSDC has continued to frustrate the implementation of actions FWS deemed necessary to prevent future take, further underscoring its liability.

*3. Fish passage barrier*

WSDC's dam is also causing take because it blocks bull trout from being able to safely swim up- and downstream to reach important habitat.

Bull trout are "naturally migratory." SUF ¶6. They migrate upstream to cold tributaries to spawn and then migrate downstream to larger rivers to overwinter as water temperatures drop. SUF ¶7. They also move up- and downstream to forage for food. SUF ¶8. Because of bull trout's migration patterns, bull trout need movement corridors with safe two-way passage up- and downstream. SUF ¶9. These migration corridors are referred to as foraging, migration, and overwintering ("FMO") habitat. SUF ¶10. This habitat is typically downstream from spawning and rearing habitat and contains all the physical elements to meet critical overwintering, migration, and developmental needs of subadult and adult bull trout. SUF ¶10. The section of the UCF at the WSD dam is designated critical habitat that provides foraging, migration, and overwintering habitat for bull trout. SUF ¶29.

Migration corridors without barriers to safe passage allow for greater growth, increased reproductive potential, and increased resiliency of local, non-migratory populations. SUF ¶11. Without migration corridors, bull trout lose access to essential

habitats, which in turn reduces population growth. SUF ¶12. The species' range is diminished, and the potential for fish with greater reproductive potential is lost. *Id.* Habitat fragmentation and population isolation, in turn, increase the probability of extinction. *Id.* Dams are well-known barriers to bull trout migration. *Wishtoyo Found.*, 2018 WL 6265099, at *58–61; SUF ¶4 (FWS's listing determination for bull trout concluded that take is likely to occur when migratory corridors used by bull trout for foraging, overwintering, and migration are significantly degraded).

The WSDC dam is no exception. The WSD dam spans the entire UCF. SUF ¶52. When flows are low, WSDC adds planks to the face of the dam to increase flows into the ditch. SUF ¶38. As a result, the dam is taller, and more of the flow is diverted. *Id.* This means that bull trout migrating through this section of the UCF have less water to navigate over a higher obstacle in the river. Ex. 1 at 14–15. Bull trout blocked by the dam are unable to reach upstream habitats and perish. *Id.*

The dam's obstruction of safe passage and resulting mortality to bull trout causes take under ESA §9.

### B. DOI has not complied with the nondiscretionary reasonable and prudent measures in the ITS.

"Take" is prohibited unless authorized by an incidental take statement and carried out in compliance with any mandatory terms and conditions and corresponding reasonable and prudent measures. 16 U.S.C. §1536(o)(2); 50 C.F.R. §402.14(i)(1)(ii), (iv). Those terms and conditions are not advisory: they are binding

requirements the action agency "must comply with" to implement reasonable and prudent measures and obtain the ESA's safe harbor from liability. 50 C.F.R. §402.14(i)(1)(iv). These measures must be a "clear, definite commitment of resources"; a "sincere general commitment to future improvements" is insufficient. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (quoting *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936, n.17 (9th Cir. 2008)); *see also* ESA Handbook at 4-48 (FWS must ensure "timely compliance with the terms and conditions" of an ITS).

"If an action agency fails to carry out the mitigation measures contained in a BiOp, it must re-initiate consultation with FWS." *Bernhardt*, 982 F.3d at 743. "If the action agency does not re-initiate consultation, the BiOp is invalid and 'any person' may bring suit and subject the action agency or the applicant to 'substantial civil and criminal penalties.'" *Id.* at 743–44 (quoting *Ctr. for Biological Diversity*, 698 F.3d at 1115); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001) ("[I]f the terms and conditions of the [ITS] are disregarded and a taking does occur, the action agency or the applicant may be subject to potentially severe civil and criminal penalties under Section 9.").

Here, the BiOp concluded NPS's irrigation practices at GRKO are likely to adversely affect designated critical habitat for bull trout, causing "critical habitats to be[] non-functional 40% of the time during annual operation" due to dewatering,

entrainment, and fish passage barriers. FWS000069. Because FWS concluded such adverse effects will likely cause take of bull trout, it issued an ITS to NPS for GRKO's operations. FWS000070. The ITS contained nondiscretionary reasonable and prudent measures ("RPMs") with corresponding terms and conditions. FWS000070. The ITS describes these as the "necessary and appropriate" steps NPS must take to minimize incidental take and maintain safe harbor from §9 liability and the duty to reinitiate consultation. FWS000071.

On Plaintiffs' first and second motions for preliminary injunction, the Court agreed that NPS "failed to make reasonable efforts to satisfy the mandatory requirements of the ITS," specifically RPM 1(C)'s requirement that NPS work with partners to install a fish screen on the West Side Ditch. The Record confirms that the same deficiencies persist for RPM 1(C), as well as the other conditions in RPMs 1, 2, and 3, to the detriment of bull trout.

*1. FWS and DOI have failed to adopt an implementation timeline.*

Mitigation measures must contain an enforceable deadline. *Bernhardt*, 982 F.3d at 743. "An indefinite mitigation measure is less likely to trigger re-consultation because it will be difficult to know at which point or whether the action agency has failed to comply." *Id*. at 744. "The development of a timeline is a routine component of an ITS, which often are complex undertakings." Doc. 98 at 8.

Here, the ITS states that that NPS and FWS will "mutually outline an

implementation timeline[.]" SUF ¶94. After more than three years, the agencies have not adopted any such timeline. SUF ¶96. Their failure to adopt an implementation timeline violates the ITS. Doc. 98 at 8.

The impact of the agencies' delay is that bull trout, not NPS, bear the harms of the agencies' ongoing inaction, which the ESA does not allow. *Ctr. for Biological Diversity*, 698 F.3d at 1115 (quoting *Marsh*, 816 F.2d at 1386) ("where mitigation measures are not carried out, any risk to listed species thereby created 'must be borne by the project, not by the endangered species'"). This is especially true here where FWS's no jeopardy or adverse modification findings are contingent on the implementation of the terms and conditions in the ITS. FWS000068 ("it is the Service's biological opinion that the proposed action, *along with the accompanying Terms and Conditions* supplied below, is not likely to jeopardize the continued existence of bull trout") (emphasis added); *see W. Watersheds Project v. McKay*, No. 22-35706, 2023 U.S. App. LEXIS 28484, at *7–8 (9th Cir. Oct. 26, 2023) (where the agency was required to identify low water conditions during field visits, but there was no schedule or standard for such visits, FWS could not rely on those plans for its no jeopardy determination).

*2. NPS has failed to implement RPM 1.*

RPM 1 requires NPS to "[i]dentify and implement means to reduce the potential for incidental take of bull trout resulting from irrigation entrainment." SUF

¶97. Term and Condition B requires NPS to, in relevant part, "work with partners to screen shared infrastructure," including WSDC. SUF ¶97. To date, the WSD headgate is unscreened, and NPS has failed to meaningfully engage the other WSDC shareholders on the installation of a fish screen. Doc. 98 at 7.

Even when a mitigation measure relies on third party actions, the action agency cannot "delegate the protection of the environment to public-private accords." *Ctr. for Biological Diversity*, 698 F.3d at 1117 (quoting *Selkirk Conservation v. Forsgren*, 336 F.3d 944, 955 (9th Cir. 2003)). The action agency must "vigilantly and independently enforce environmental laws," *id.*, and an agency's failure to enforce these laws "fall[s] far below *insuring* that the project is not likely to jeopardize the continued existence" of listed species, *Marsh*, 816 F.2d at 1385 (emphasis in original).

Funding for the fish screen was initially available from the State of Montana's Natural Resource Damage Program in or around June 2024. SUF ¶101. Since that time, NPS's engagement with WSDC on the fish screen consists of four emails. On November 18, 2024, NPS asked WSDC President Pat Verlanic if the shareholders could meet about accepting funds for a fish screen. SUF ¶102. When Verlanic responded that the other shareholders were against the screen, NPS did nothing. A year later, in November 2025, NPS alerted Verlanic that Trout Unlimited still had funding for a fish screen. SUF ¶105. On January 12, 2026, NPS introduced Verlanic

and a representative from Trout Unlimited. *Id*. And on August 18, 2026, weeks after the WSDC shareholders received the design options for the fish screen and diversion replacement and Verlanic emailed NPS asking which design it preferred, NPS responded with its recommendation. SUF ¶112.

NPS has not instigated or developed a plan for screening, advocated for or organized shareholder support for the fish screen, addressed the concerns of shareholders, sought funding, or otherwise diligently pursued the installation of a fish screen on WSD. SUF ¶115; Doc. 98 at 8. NPS also has done nothing to advocate for or otherwise encourage the other shareholders to select a design within the timeframe requested by Trout Unlimited, despite the possibility that WSDC's delay will result in the grant funds expiring before the design is complete. SUF ¶¶109–15.

NPS's inaction violates the ESA. Doc. 98 at 8; *Marsh*, 816 F.2d at 1385 (finding §9 violation where the Army Corps took no action until the plaintiffs filed suit to force the County of San Diego to complete a land transfer required by the Corps' ITS); *cf. Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1179 (9th Cir. 2004) (holding the Corps' dam operations' noncompliance with water standards under the Clean Water Act was lawful because the Corps made "good-faith and diligent efforts... to do all that is feasible to avoid" such noncompliance).

Again, bull trout bear the consequences of NPS's inaction. As this Court has held, instead of meaningfully engaging WSDC on fish screen installation, NPS

"allows West Side to continue its entrainment and dewatering impacts on bull trout, even in low flow time periods." Doc. 98 at 8. As in *Marsh*, the agency's inaction in ensuring implementation of a mitigation measure involving a third party is allowing the "adverse effects to accumulate without implementing the mitigation measure or making certain they will occur," in violation of the ESA. 816 F.2d at 1385.

*3. NPS has failed to implement RPM 2.*

RPM 2 requires NPS to "[i]dentify and implement means to reduce the potential for incidental take of bull trout resulting from fish passage barriers." SUF ¶116. Term and Condition D requires NPS to, in relevant part, assess the WSD for fish passage during a range of flows and conditions. *Id.*

As described, WSDC's dam is a barrier to fish passage during low flows. However, NPS has not meaningfully engaged the other WSDC shareholders on replacing the structure. SUF ¶119. To date, NPS has simply advised WSDC that NPS supports the option in the fish screen design package to replace the structure. SUF ¶112. Like the fish screen, NPS's passivity in eliminating this barrier to fish passage is not compliant with the agency's rigorous obligations under the ESA.

*4. NPS has failed to implement RPM 3.*

RPM 3 requires NPS to "[i]dentify and implement means to reduce the potential for incidental take of bull trout from dewatering impacts." SUF ¶120. RPM 3's terms and conditions require NPS, in relevant part, to conduct an instream flow

study and develop a low flow/drought management plan for GRKO. *Id*. After more than three years, NPS has completed neither.

The section of the UCF in the action area has not been evaluated to determine the flows necessary to support bull trout and bull trout critical habitat. SUF ¶68. As such, the BiOp utilizes the wetted perimeter method, which measures the flows required to provide the sufficient wetted area in the riverbed to provide the necessary food supply to maintain a fishery. SUF ¶¶68–69. Though the wetted perimeter method is currently the best available science, according to the BiOp, the method is limited because it does not consider other habitat attributes, like water temperature, which are also important to sustain bull trout. SUF ¶68. To fill this gap, the ITS requires NPS to conduct an instream flow study to identify the flow needs for adult and subadult bull trout.

An instream flow study is neither complete, nor has NPS made meaningful progress on its completion in the three years since the BiOp. In 2023, NPS did nothing to complete the instream-flow study or drought plan. SUF ¶121. In 2024 and 2025, all NPS did was have "conversations" about the study and plan. *Id*. In 2026, NPS developed an estimate for when the instream flow study might be done. *Id*.

NPS also has not developed a low flow/drought management plan. SUF ¶122. In fact, in its February 20, 2026 annual report to FWS concerning implementation of the RPMs, NPS seems to absolve itself of its duty to timely develop a plan, stating

that it has "limited actions available to improve flows before reaching 90 cfs" and that "[f]urther information would be provided upon completion of the instream flow study around Fall 2028." *Id.* As a result, NPS has further delayed developing a drought plan until five years after the ITS was put in place. Such delay does not comply with the ESA.

5. *NPS has caused take of bull trout.*

As described, the WSDC headgate entrains fish and its dam blocks essential bull trout movement. NPS is a 16% shareholder in WSDC, participates as a voting member, and has voluntarily contributed to other ditch operations like annual cleaning. SUF ¶¶37–38. Yet, as described, NPS has made no meaningful effort to mitigate the take WSDC's infrastructure causes. Therefore, WSDC's take is NPS's take. *Ctr. for Biological Diversity*, 698 F.3d at 1117 (agency must "vigilantly and independently" ensure compliance with the ESA); *cf. Nat'l Wildlife Fed'n*, 384 F.3d at 1179.

**C. FWS's failure to assess the cumulative effects of the other diversions and diversion structures in the action area in the BiOp violates ESA §7.**

Under ESA §7(a)(2), FWS's Biological Opinion must "evaluate the current status and environmental baseline of the listed species or critical habitat," the "effects of the action," and any "cumulative effects." *Alliance for the Wild Rockies v. Marten*, 685 F.Supp.3d 971, 977 (D. Mont. 2023) (quoting *Conservation Congress*

*v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013)); 50 C.F.R. §402.14(g)(3). Cumulative effects are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. §402.02. FWS then must "[a]dd the effects of the action and cumulative effects to the environmental baseline[.]" *Marten*, 685 F.Supp.3d at 977 (citing 50 C.F.R. §402.14(g)(4)). "[I]n light of the status of the species and critical habitat," FWS formulates an "opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. §402.14(g)(4).

FWS's cumulative effects analysis is analyzed under APA §706(2). *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). APA §706(2) allows a court to "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2). Agency action is arbitrary and capricious where the agency fails to consider an important aspect of a problem. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); 5 U.S.C. §706(2)). A reviewing court "must not 'rubber-stamp... administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional

policy underlying a statute.'" *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236 (quoting *N.L.R.B. v. Brown*, 380 U.S. 278, 291 (1965)).

Here, FWS failed to consider the cumulative impacts of the irrigation practices of other WSD users and other UCF irrigation diversions on bull trout and bull trout critical habitat. NPS's operations at GRKO are only one piece of the bull trout puzzle in the UCF. Ignoring those other pieces obscures the cumulative impacts from other diversions also blocking bull trout migration, entraining fish, and dewatering the UCF. FWS's failure to consider these impacts on bull trout undermines its jeopardy and adverse modification determinations regarding GRKO's impacts to bull trout and its critical habitat.

FWS relegated its discussion of the cumulative impacts of the other UCF irrigation diversions to two sentences in the BiOp describing how irrigation by private landowners reduces available water and pool depth, diversions impede migration, and unscreened ditches can cause entrainment. FWS000066. FWS's decision to merely "identify the causes" of the potential impacts to bull trout rather than engaging in any quantitative or qualitative analysis is not sufficient. *Natural Res. Def. Council v. Kempthorne*, 506 F.Supp.2d 322, 375 (N.D. Cal. 2007). Without a quantitative or meaningful qualitative analysis of these cumulative impacts, FWS fails to actually assess whether NPS's operations at GRKO would "deepen" the already "precarious survival" of the bull trout and its degraded habitat conditions in

the UCF in violation of the ESA. *Id*. at 375–76.

Specifically, the BiOp does not note any physical barriers to fish passage in the action area other than the WSD. SUF ¶53. However, the Sager Lane diversion dam, another full-spanning pin-and-plank dam located in the action area, is considered a "complete seasonal fish passage barrier" in the UCF. SUF ¶54.

The BiOp also does not mention the entrainment hazard posed by the Valiton Ditch, which is just downstream of the WSD. SUF ¶¶62–63. Like the WSD, the Valiton Ditch has a water control structure that spans the entire UCF and an old, unscreened headgate. SUF ¶62. The headgate also poses a "significant ditch entrainment risk" to fish. *Id*. One water user on the ditch has personal knowledge of thousands of fish being entrained in the ditch annually. *Id*.

Regarding dewatering, the BiOp does not analyze the impacts of the other water users in the action area on the UCF. Between Galen and Sager Lane, five irrigation canals divert up to 75% of the available water in the UCF in later summer: the Alvi Beck, Whalen, West Side, and Valiton diversions, and Sager Lane pumps and diversion. SUF ¶67. "At the lower end of this reach, near Sager Lane, late summer flows can be depressed to as low as 12 cfs – far below levels that can sustain healthy aquatic life." *Id*. Of these canals, NPS only has shares in West Side Ditch. *Id*.

The Record shows that the other irrigation infrastructure in the UCF

contributes to the dewatering (though to a lesser degree than WSD). SUF ¶67 (describing Valiton Ditch's "high water losses," Sager Lane's "[l]arge, inefficient pumps," the "[i]nefficient" Alvi Beck ditch, and piping proposed on Whalen to "conserve large amount of flow"). Yet, FWS considers none of these contributions in the BiOp.

Finally, FWS failed to consider the cumulative impacts of the non-federal West Side Ditch users. NPS has reported that it "rarely receives their allocated water right" on the West Side Ditch and that it would need to obtain court-appointed ditch riders "to make sure all users are not taking more water than their right allows." SUF ¶66. Those facts indicate that the other ditch users account for much of the actual depletion from the system. By isolating NPS's comparatively limited diversion while disregarding the substantially larger withdrawals of the other ditch users, FWS failed to evaluate the cumulative effects of the water-use regime actually affecting bull trout and critical habitat in the UCF.

The BiOp is arbitrary and capricious because it fails to consider an important aspect of the problem. *Lands Council*, 395 F.3d at 1026. By failing to adequately assess the cumulative effects of non-Federal water users on bull trout and critical habitat in the UCF, FWS's no-jeopardy and no adverse modification conclusions are not rationally based on the facts before the agency, violating ESA §7 and the APA.

## CONCLUSION

For these reasons, Plaintiffs request this Court grant summary judgment in Plaintiffs' favor; declare that DOI and WSDC are violating ESA §9 and that the GRKO BiOP violates the law. Plaintiffs ask the Court to maintain the current protective standards of the ITS while remanding the BiOp to the agencies until such time as the agencies demonstrate to this Court that they have adequately complied with the law; order Defendants to stop diverting from the UCF when flows are below 110 cfs to ensure a buffer above the minimum 90 cfs, award Plaintiffs costs, expenses, and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other statute; and grant Plaintiffs any such further relief as may be just, proper, and equitable.

DATED this 9th day of September, 2026.

/s/ Timothy M. Bechtold
Bechtold Law Firm, PLLC

/s/ Alizabeth A. Bronsdon
Bronsdon Law Firm PLLC

/s/ Elizabeth M. Forster
Forster Law, PLLC

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief is in 14-point font and has 6,433 words, exclusive of any captions, tables, certificates, and signature blocks.

DATED this 9th day of September, 2026.

/s/ Elizabeth M. Forster
Forster Law, PLLC